# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| APRIL PAWLOW,<br><br>               Plaintiff,<br> v.<br><br>DEPARTMENT OF EMERGENCY<br>SERVICES AND PUBLIC PROTECTION,<br><br>        Defendant. | Case No. 3:14-cv-1282 (CSH)<br><br><br><br>MARCH 23, 2016 |

## RULING ON MOTION TO DISMISS

**HAIGHT, Senior District Judge::**

Plaintiff April Pawlow, a state trooper with the Connecticut Department of Emergency Services and Public Protection, Division of the State Police, brings this suit for discrimination on several federal and state grounds. Plaintiff is suing the State of Connecticut Department of Emergency Services and Public Protection, Connecticut State Police Division for claims arising under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e), the Fair Labor Standards Act (29 U.S.C. § 207(r)(1)), the Connecticut Fair Employment Practices Act (Conn. Gen. Stat. 46a-60(a)(1) and 46a-60(a)(5)), and Connecticut General Statutes §§ 31-40(w)(b)-(C). Plaintiff alleges that after her return from maternity leave, she was discriminated against because of her need to express breast milk.[1] The Defendant has filed a [Doc. 11] motion to dismiss, which this ruling decides.

---

[1] The phrase "express breast milk," as used in this case, means that a woman compresses her breast, by hand or using a pump, so that milk comes out.  The milk is collected in a container and fed to an infant.  *See* www.babycenter.com (visited March 21, 2016).  The record on this motion shows that Plaintiff used a pump.

## I.

On March 21, 2013, Pawlow returned from maternity leave to her position as a state trooper. Doc. 1, ¶ 8.[2] On that same day, Pawlow informed her supervisor, Sergeant Whelan, that she would need to express breast milk during her midnight shift. Doc. 1, ¶ 9.[3] Pawlow noted to Sergeant Whelan that she could use her breast pump either in the troop barracks or in a resident trooper's office. Doc. 1, ¶ 10. Sergeant Whelan said that Pawlow could go home during her shift to pump breast milk. Doc. 1, ¶ 11.[4] Pawlow asked how her availability would be handled, because she could not respond to calls while pumping. Doc. 1, ¶ 13. Sergeant Whelan's response was that she should inform dispatch that she was on break, and he would inform other Sergeants about her needs. Doc. 1, ¶ 14.

A couple of weeks later, on April 10, 2013, Pawlow was working an overtime shift under Sergeant Derry. Doc. 1, ¶ 15. Sergeant Derry asked to see Pawlow in his office after roll call. Doc. 1, ¶ 16. During this interaction, Sergeant Derry told Pawlow that her eye glasses were against policy

---

[2] The Court notes that there was an error in numbering the paragraphs in the Complaint. This citation to paragraph 8 refers to the second paragraph 8.

[3] This citation to paragraph 9 refers to the second paragraph 9.

[4] Many of the allegations in the Complaint are made "upon information and belief." The Court must be skeptical of allegations based on "information of belief" that do not "make the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010); *see also Salmon v. Blesser*, No. 1:13 CV 1037 MAD/RFT, 2014 WL 1883552, at *4 (N.D.N.Y. May 12, 2014) *aff'd in part, vacated in part and remanded on other grounds*, 802 F.3d 249 (2d Cir. 2015). However, the Court also notes that the phrase "upon information and belief" is generally reserved for statements made based on "secondhand information that the declarant believes is true." Bryan A. Garner ed., *Black's Law Dictionary*, (7th ed. 1999). The Court notes that many of the assertions containing this statement are in fact based on Plaintiff's first hand knowledge, for example "Upon information and belief, . . . Sergeant Whalen told Plaintiff that she should go home during her shift in order to accommodate her nursing."

because the designs on the sides "did not match the uniform and were unacceptable and not professional." *Id.* Pawlow asked if she was being ordered to purchase new glasses and was told to "do what you have to do." *Id.* Pawlow then asked if there was any policy in the State Police Administrative Operations Manual ("A&O") regarding eye glasses, and was told that there was. Doc. 1, ¶ 17.

Pawlow was unable to find any such policy in the A&O. Doc. 1, ¶ 18. Additionally, no other senior officer that she consulted agreed that her eye wear was against policy. *Id.* Pawlow's glasses were the same glasses she wore before her maternity leave, and she had never been told they were unacceptable before April 2013. *Id.*

Additionally, other officers suggested that the directive regarding her glasses "was because she was a female." Doc. 1, ¶ 19. The officers also suggested that she should document the chain of events and that she should not change her eye glasses. *Id.*

Shortly thereafter, on April 13, 2013, Sergeant Whelan told Pawlow that if Sergeant Derry saw her still wearing her glasses, that "he'd make you get rid of them." Doc. 1, ¶ 20. Furthermore, on April 22, 2013, Sergeant Whelan followed up with Pawlow and said that Sergeant Derry would be "looking for you to change your glasses." Doc. 1, ¶ 21.

On April 22, 2013, Pawlow emailed Sergeant Derry to request that he put any directives to her in writing. Doc. 1, ¶ 22. In response, Sergeant Derry emailed to say that he had not directed her to purchase new glasses, but that her current glasses "'detracted from presenting professional appearance while in uniform' and that she had until April 26, 2013 to 'remedy' the situation". Doc. 1, ¶ 23. Pawlow expressed to a more senior trooper, Trooper Kathy Henry, that she was concerned

Sergeant Derry's directive was given because he disliked the presence of women on the force. Doc. 1, ¶ 24.

Thereafter, the Complaint alleges on information and belief that Master Sergeant Torneo requested a photo of Pawlow's glasses from a third Sergeant, Tomasetti. Doc. 1, ¶ 25. Presumably, Master Sergeant Torneo is the superior of Sergeants Derry, Whelan, and Tomasetti, though the Complaint does not describe their relationship. Pawlow further alleges upon information and belief that Master Sergeant Torneo stated to Sergeant Tomasetti that Pawlow "was 'going home to feed her kid or something and we don't have to let her do that, so why doesn't she just drop the glasses issue?'" Doc. 1, ¶ 26.

Pawlow then engaged her union regarding the eye glasses. Doc. 1, ¶ 27. On April 25, 2013, Pawlow provided a memorandum stating that because she was not in violation of any A&O directive, she would continue to wear her glasses. *Id.*

On April 26, 2013, Sergeant Derry expressed to Pawlow that she was getting herself into trouble by not following orders, by not responding in writing as required, and by not making the changes to her eye glasses. Doc. 1, ¶ 28.

On April 30, 2013, Pawlow met with the Master Sergeant and the Lieutenant on the issue. Doc. 1, ¶ 29. Pawlow brought along her union representation. *Id.* Pawlow was told that she was insubordinate for failing to follow orders. *Id.* Pawlow was given the choice of taking a negative "Trooper Performance Observation Report" and changing her glasses or being subjected to an internal affairs investigation on the issue. *Id.* Though unclear from the Complaint, the briefing on the motion to dismiss makes clear that Pawlow was ultimately given a negative "Trooper

Performance Observation Report." Doc. 15, p. 6. Pawlow, however, refused to change her glasses and grieved the issue, believing it to be in retaliation for her gender and maternity status. Doc. 1, ¶ 30. On about May 5, 2013, Pawlow was told by Trooper Henry that the issue was "dead" from above and she could continue to wear her eye glasses. Doc. 1, ¶ 31.

During the time of this conflict, Pawlow was still returning home during her shift to express breast milk. Doc. 1, ¶ 32. However, on March 22, 2013, Pawlow was required to attend an "in-service training" at the police academy. Doc. 1, ¶ 33. There was no accommodating area available for her during this training for her to use the breast pump. *Id.* Pawlow was instead instructed to use the women's locker room, which had no locking door. *Id.*

During a subsequent shift, Pawlow was dispatched to a call despite being unavailable due to breast pumping. Doc. 1, ¶ 35. Pawlow rushed to the call, but still had to explain to fellow officers why she was not able to respond to the call in a timely manner. *Id.* To avoid such issues going forward, Pawlow began to text the other officers to let them know she was pumping and unavailable. Doc. 1, ¶ 36. This caused Pawlow to feel embarrassed. *Id.*

Finally, on April 2, 2013, Pawlow was required to attend training at a gun range in order to qualify for a new weapon. Doc. 1, ¶ 37. Pawlow "assumed" that there would be an area at the range where she could use her breast pump; however, when she arrived, she realized that there was no running water at the range and no private rooms. *Id.* The range only had "porto-potties," which were not sufficiently clean or appropriate for use. *Id.* Pawlow had to request that an employee leave a particular area so that she could use her breast pump. Doc. 1, ¶ 38.

Pawlow's treatment during this period by her employer caused "undue emotional stress,

hardship, and an invasion of her privacy." Doc. 1, ¶ 40. This, coupled with the irregularity in when

Pawlow could pump, caused Pawlow to experience a diminished production of breast milk. Doc. 1,

¶ 41. This ultimately led her to stop breast feeding. Doc. 1, ¶ 42.

## II.

Defendant moves to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1)

for lack of subject-matter jurisdiction and 12(b)(6) for failure to state a claim upon which relief can

be granted. Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

To survive a motion to dismiss under 12(b)(6), "a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ascroft v. Iqbal*, 566 U.S. 662,

678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (1955)).  A complaint must

provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556

U.S. at 678.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements

of a cause of action will not do.'"  *Id*.  (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint

suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.*  (quoting

*Twombly*, 550 U.S. at 557).  "Although for the purposes of a motion to dismiss we must take all of

the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion

couched as a factual allegation.'" *Id*. (quoting *Twombly*, 550 U.S. at 555).  "While legal conclusions

can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679.

Furthermore, "[w]hen there are well-pleaded factual allegations, a court should assume their

veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556

U.S. at 679.  This requires the plaintiff to plead facts "allow[ing] the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  Importantly, the complaint must demonstrate "more that a sheer possibility that a defendant has acted unlawfully." *Id*.  "[W[here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not 'show[n]'  – 'that the pleader  is entitled to relief.'"  *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.[5]

Under Rule 12(b)(1), a case is properly dismissed where the court lacks the "statutory or constitutional power to adjudicate the case." *Perez v. Connecticut Dept. Of Correction Parole Div.*, 2013 WL 4760955, at *2 (D. Conn Sept. 4, 2013) (*citing Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)). In general, the standard for review for 12(b)(1) and 12(b)(6) are "substantively identical." *Kuck v. Danaher*, 822 F.Supp.2d 109, 123–24 (D. Conn, 2011). Whereas the burden generally falls to the plaintiff to prove subject matter jurisdiction, where a "defendant official or governmental entity asserts the Eleventh Amendment as the basis of the 12(b)(1) motion, the burden falls to that entity to prove its entitlement to dismissal on the grounds of immunity from suit." *Perez*, 2013 WL 4760955, at *2 (*citing Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*, 466 F.3d 232, 239 (2d Cir. 2006)).

---

[5] The foregoing summary of the *Twombly/Iqbal* pleading standards is adapted from the Second Circuit's opinion in *Pension Benefit Guaranty Corp. ex rel. Saint Vincent Catholic Medical Centers  Retirement Plan v. Morgan Stanley Investment Management Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013).

**III.**

**A.      Title VII Claim**

Under Title VII, the Court undertakes a three part analysis laid out in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973). The initial burden of establishing a prima facie case of discrimination rests on the plaintiff. *Id.* A prima facie case is shown by establishing that the plaintiff (i) is a member of a protected class; (ii) is qualified for the position; (iii) suffered an adverse employment decision; and (iv) the decision gives rise to an inference of discrimination on the basis of plaintiff's membership in a protected class. *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (*citing Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). Once the plaintiff has made the prima facie showing, the burden shifts to the employer defendant to show "some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp*, 411 U.S. at 802. Finally, the burden shifts back to the plaintiff to show that the defendant's reasons are pretextual. *Id.*

Defendant asserts that Plaintiff is unable to establish a prima facie showing of discrimination under Title VII because she does not sufficiently allege an adverse employment decision. However, Plaintiff claims that she alleged several adverse employment decisions: that she was accused of insubordination, and that she was given a negative trooper observation report, despite the "lack of authority in the operation manual for the actions taken against her"; and that she was required to leave work to express breast milk and was not accommodated during special programming at work with regards to expressing breast milk. Doc. 15, p. 6–7. There is some ambiguity in Plaintiff's pleadings, but a reading of the complaint in a way most favorable to her supports Plaintiff's claims

8

in her briefs that she was given a negative "Trooper Performance Observation Report."

An adverse employment action is a "materially adverse change in the terms and conditions of employment." *Joseph v. Thompson*, 2005 WL 3626778, at *4 (E.D.N.Y. Mar. 23, 2005) (*citing Galabva v. New York City Board of Education*, 202 F.3d 636, 640 (2d Cir. 2000) *and Castro v. New York City Board of Education Personnel*, 1998 WL108004, at *6 (S.D.N.Y. Mar. 12, 1998)). The materially adverse change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* However, materially adverse employment actions are not limited to "pecuniary enoluments." *Preda v. Nissho Iwai Amer. Corp.*, 128 F.3d 789, 791 (2d Cir. 1997). Adverse employment actions have been defined broadly to include reprimands, negative evaluation letters, and express accusations of lying. *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999). "As a general matter, the Second Circuit has held that there is no bright line rule for determining 'whether the challenged employment action reaches the level of 'adverse,' and that courts must therefore 'pore over each case' to make this determination." *Brown v. Snow*, 2003 WL 1907974, at *3 (S.D.N.Y. Apr. 17, 2003).

### i.      Failure to Accommodate Breast-pumping

Pawlow asserts that the failure to accommodate her breast-pumping at the office, instead directing her to "go home during her shift which was inconvenient and caused her to be unavailable without notice," amounts to an adverse employment action. Doc. 15, p. 7. Additionally, Pawlow alleges that she twice had difficulties finding an acceptable place to express breast milk during programming required by her department that departed from her normal schedule, and that this amounts to an adverse employment action. Doc. 1, ¶¶ 33–34 and ¶¶ 37–38.  Finally, Pawlow was

once dispatched to a call despite being unavailable, and was unable to respond in a timely fashion, and had to explain to her fellow officers why she was late. Doc. 1, ¶ 35. She claims that this was also an adverse employment action.

Defendants argue that these assertions cannot amount to an adverse employment action because she was, at most, not given a proper area to pump breast milk, and the "remedy for such an alleged violation lies with the Department of Labor under the Fair Labor Standards Act." Doc. 11-1, p. 8.

Defendants cite to *Martinez v. N.B.C., Inc.*, 49 F.Supp.2d 305, 311 (S.D.N.Y. 1999), for the proposition that an employer's "alleged failure to provide [the employee] with acceptable facilities for breast milk pumping . . . is not an employment practice covered by Title VII and that if breast feeding is to be afforded protected status, it is Congress alone that may do so." However, more recent caselaw has narrowed the broad language of *Martinez*. In *EEOC v. Vamco Sheet Metals, Inc.*, 2014 WL 2619812, at *6 (S.D.N.Y. June 5, 2014), the court distinguished *Martinez* because the plaintiff was asserting that pregnancy and related medical conditions are disabilities under the Americans with Disabilities Act, whereas the plaintiff in *Vamco Sheet Metals* was asserting that treatment related to her lactation breaks amounted to an adverse employment action under the Pregnancy Discrimination Act, as is the case here.[6] The court in *Vamco Sheet Metals* agreed with the distinction, and held that "[w]here a plaintiff's claim focuses on adverse employment actions or conditions relating to her lactation breaks, as opposed to an alleged failure to accommodate a

---

[6] "Title VII encompasses the Pregnancy Discrimination Act of 1978, enacted by Congress to ensure that Title VII sex discrimination claims include discrimination based on pregnancy, child birth, or related medical conditions." *EEOC v. Vamco Sheet Metals, Inc.*, 2014 WL 2619812, at *6 (S.D.N.Y. June 5, 2014) (*citing* 42 U.S.C. § 2000e-(k)).

disability, an employer may be liable under Title VII." *Id.*

Having established that actions related to lactation can constitute adverse employment actions under Title VII, the question remains whether the Plaintiff has plead sufficient actions taken by the Department to constitute an adverse employment action. Plaintiff has alleged two instances of a failure to accommodate her need to express breast milk, resulting in her using a locker room with no lock and an area used to make bullets. She has also alleged that she was required to go home to express breast milk, which was "inconvenient and caused her to be available without notice." Doc. 15 p. 7. Unlike the plaintiff in *Vamco Sheet Metals, Inc*, there are no allegations that Plaintiff was harassed for taking the breaks, or that she ultimately lost her job. 2014 WL 2619812, at *6. Nor is it alleged that she was denied breaks to express breast milk. Instead, what Plaintiff alleges amounts to an inconvenience. It is not clear from the complaint whether Plaintiff protested the arrangement for her to return home to pump breast milk, only that she asked how she should let dispatch know that she was unavailable. These allegations are insufficient to establish an adverse employment decision based on a failure to accommodate her need to express breast milk.

### ii.   Accusation of Insubordination and Negative Evaluation

Several Courts have considered whether a negative review, accusation, or note in an employee's file is sufficient to constitute an adverse employment action. In *Presley v. Pepperidge Farm*, *Inc.*, 356 F.Supp.2d 109, 125 (D. Conn. 2005), the Plaintiff was not hired for a job after her prior employer, the defendant in the case, provided a negative employment recommendation. The Court held that was sufficient to constitute an adverse employment action because a reasonable juror could find that the recommendation caused the Plaintiff to lose a job opportunity. *Id.* On the other

hand, a "notice of discipline" was insufficient in *Weeks v. New York State (Division of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001), to amount to an adverse employment action where no ramifications or effects of the notice were described, how or why any effect would be serious, whether the notice of discipline went into any file, or whether it was in writing. *See also Sanders v. New York City Human Resources Administration*, 361 F.3d 749, 756 (2d Cir. 2004) (no adverse employment action where plaintiff offered no proof that a negative evaluation had any effect on the terms and conditions of employment). A "reprimand" was also considered insufficient where an employee offered "no suggestion that [the] reprimand actually had any tangible effect on his employment." *Brierly v. Deer Park Union Free School District*, 359 F.Supp.2d 275, 300 (E.D.N.Y. 2005). The court in *Brierly v. Deer Park Union Free School District* went on to say that "[r]eprimands that do not lead to adverse employment consequences are generally not considered actionable forms of retaliation." *Id; see also Honey v. County of Rockland*, 200 F.Supp.2d 311, 320 (S.D.N.Y. 2002) ("[C]ourts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation.")

In this case, Pawlow asserts that she faced both an accusation of insubordination and a negative "Trooper Performance Observation Report." However, Pawlow has not alleged the ramifications of a negative "Trooper Performance Observation Report." She has not described whether it has prevented her from obtaining a promotion, nor whether it has had any negative affect on her day-to-day duties. Here, Pawlow's allegations are similar to those in *Weeks*, because Pawlow has failed to allege what effect this negative "Trooper Performance Observation Report" had on her

employment, and if the effect is serious. Furthermore, Pawlow has not alleged whether the "accusation of insubordination" has had any effect on her employment, whether the effect is serious, whether it has been added to her employment file, or whether it was verbal or in writing. Finally, Pawlow's complaint is unclear on whether either the negative "Trooper Performance Observation Report" or the accusation of insubordination remained in her file once she was notified that the eyeglass issue was "dead from above" and that she could continue to wear her eyeglasses as they were. Pawlow's allegations regarding the accusation of insubordination and the "negative trooper observation report" do not amount to a plausible claim of an adverse employment action, and thus cannot sustain a claim under Title VII.

Accordingly, Count One of the Complaint is dismissed with leave to refile if she can clarify what effect the negative "Trooper Performance Observation Report" had on her employment and how serious the effect is on her employment. Plaintiff should only refile if she believes that, in a manner consistent with Fed. R. Civ. P. 11, she can allege that negative "Trooper Performance Observation Report" led to negative, tangible effects on her employment.

**B.     Fair Labor Standards Act**

Defendants raises for the first time in its reply brief an argument that the Plaintiff's Fair Labor Standards Act ("FLSA") claim is barred by Eleventh Amendment Governmental Immunity. The Eleventh Amendment operates in much the same way as subject matter jurisdiction, meaning it may be raised at any time. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (2005) ("The [Eleventh] Amendment . . . enacts a sovereign immunity from suit, rather than a non-waivable limit on the Federal Judiciary's subject-matter jurisdiction."); *see also* U.S. CONST. Art. III § 2;  U.S.

CONST. amend. XI.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Supreme Court has also interpreted the Eleventh Amendment to bar suits against a state by its own citizens. *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974) ("[w]hile the Amendment by its terms does not bar suits against a State by its own citizens, this Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State."). The case at bar implicates the Eleventh Amendment because the Defendant is a department of the State of Connecticut.

The sovereign immunity contemplated by the Eleventh Amendment is not absolute. There are two ways in which a state may be brought into federal court: (1) Congress may eliminate a state's sovereign immunity through an unequivocal expression of its intent to do so, *see Green v. Mansour*, 474 U.S. 64, 68 (1985), or (2) a state may waive its immunity and agree to suit in federal court, *see Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985).

In the case at bar, plaintiff asserts a claim under the FLSA. The Second Circuit, in *Close v. State of New York*, 125 F.3d 31, 36–37 (2d Cir. 1997), held that suit against a state under the FLSA is barred by the Eleventh Amendment. Though Congress had unequivocally expressed its intent to abrogate the immunity,[7] the Second Circuit found that it had not acted "pursuant to a valid

---

[7] "The FLSA provides, in pertinent part, that: '[a]n action to recover the liability prescribed . . . may be maintained against any employer (including a public agency) in any Federal or state court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.'" *Close*, 125 F. 3d at 36 (*quoting*

14

exercise of power," as required by *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996). *Id.* In *Seminole*, the Supreme Court held that "[t]he Eleventh Amendment restricts the judicial power under Article III, and Article I [commerce power] cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Seminole*, 517 U.S. 44 at 72. Thus, the FLSA does not successfully abrogate state sovereign immunity under the Eleventh Amendment.

Additionally, the state has not waived its Eleventh Amendment defense in this case or by statute. *See York v. State*, 2014 WL 3805590, at *4 (Conn. Super. Ct. June 25, 2014) ("[n]o Connecticut statute expressly states that sovereign immunity is waived with respect to actions brought under the FLSA.") Thus Count 5 is barred by the Eleventh Amendment, and is dismissed. Because Count 5 is dismissed on these preliminary grounds, the court need not reach the question of whether there is a right to individual enforcement of § 207(r)(1) of the FLSA.

## C.    Connecticut General Statute §§ 46a-60(a)(1), 46a-60(a)(4), and 46a-60(a)(5)

Plaintiff asserts violations of Connecticut General Statutes §§ 46a-60(a)(1), 46a-60(a)(4), and 46a-60(a)(5), collectively known as the Connecticut Fair Employment Practices Act ("CFEPA") in Counts Two, Three, and Four of the Complaint. Defendant argues that the state has not consented to suit in federal court for CFEPA claims, and therefore the claims must be dismissed under the Eleventh Amendment. Plaintiff responds that she does not claim that the state has waived Eleventh Amendment immunity, but that the Plaintiff is seeking the exercise of supplemental jurisdiction pursuant to 28 U.S.C.A. §1367.

As a preliminary matter, to address the Plaintiff's argument that the court can exercise

---

29 U.S.C. § 216(b)).

supplemental jurisdiction over these claims even where Eleventh Amendment immunity is not waived, it is clear that "neither pendent jurisdiction or any other basis of jurisdiction may override the Eleventh Amendment." *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 121 (1984). Even the considerations of judicial economy, convenience, and fairness to litigants underlying pendant jurisdiction cannot overcome a constitutional limit on judicial authority. *Id.* (*citing Missouri v. Fiske*, 290 U.S. 18, 25–26 (1933)).

Furthermore, each of these claims is barred by the Eleventh Amendment. The Eleventh Amendment, as noted above, prevents the federal courts from hearing suits against a state by its citizens, among others. *Edelman*, 415 U.S. at 662–63. However, there are two exceptions: (1) Congress can abrogate immunity through statutory enactment or (2) a State may waive its immunity and agree to be sued in federal court. *Close*, 125 F.3d at 36. The first exception does not apply in these circumstances. Here, Connecticut has not waived its Eleventh Amendment immunity to suit in federal court. For that to be the case, there must be an unequivocal expression of waiver by Connecticut. Instead, the law states that suit under CFEPA may be brought "in the superior court for the judicial district in which the discriminatory practice is alleged to have occurred or in which the respondent transacts business." Conn. Gen. Stat. § 46a-100. These suits were expressly limited to state court by the Connecticut legislature.

Furthermore, the case law comports with this reading of the statute. *See Daniels v. Connecticut*, 2015 WL 4886455, at *19 (D. Conn. Aug. 17, 2015) ("Under the [CFEPA], Connecticut has waived its immunity with respect to suits in state court, but not with respect to suits in federal court."); *Wagner v. Conn. Dep't of Corrections*, 599 F.Supp.2d 229, 237 (D. Conn. 2009)

("Under CFEPA, the State has waived its immunity only as to cases brought in the Connecticut Superior Court."); *Garris v. Department of Correction*, 170 F.Supp.2d 182, 186–87 (D. Conn. 2001) ("[T]here is nothing in the Connecticut Statutes that constitutes an express waiver of Eleventh Amendment immunity for CFEPA claims. Absent an "unequivocal expression" or "clear declaration" of consent to defend CFEPA suits in federal court, the court may not find such a waiver of Eleventh Amendment immunity."); *Lyon v. Jones*, 168 F.Supp.2d 1, 6 (D. Conn. 2001) ("[T]his court has found that there is nothing in the Connecticut General Statutes that constitutes an express waiver of Eleventh Amendment immunity for CFEPA claims."); *Walker v. Connecticut*, 106 F.Supp.2d 364, 370 (D. Conn. 2000) ("This Court declines Plaintiff's invitation to hold that simply because the State has consented to be sued in state court it *a fortiori* must have meant to consent to federal jurisdiction."). Thus, the Court grants the Defendant's motion to dismiss on these counts. The CFEPA claims in Counts Two, Three, and Four are dismissed without prejudice to refile in state court.

## D.   Connecticut General Statute §§ 31-40(w)(b) and 40(w)(c)

Plaintiff has asserted two additional state law claims. Connecticut General Statute § 31-40(w)(b) requires employers to make reasonable efforts to "provide a room or other location, in close proximity to the work area, other than a toilet stall, where the employee can express her milk in private." Conn. Gen. Stat. § 31-40w(b). Connecticut General Statute § 31-40(w)(c) provides that an employee may not discriminate against an employee for exercising her rights to express breast milk at work during a meal or break period. Conn. Gen. Stat. § 31-40w(c). Defendant argues that these claims are barred by the Eleventh Amendment and by common law sovereign immunity. Plaintiff

17

asserts that the Court can exercise jurisdiction over these claims under supplemental jurisdiction. For the reasons stated above, this argument regarding supplemental jurisdiction fails to persuade the Court. Plaintiff also argues that the claims should be dismissed with leave to refile because the claims based on these statutes are novel issues of state law that would more properly be decided by Connecticut state courts.

As stated above, the state can only waive Eleventh Amendment immunity to suit in federal court through express and unequivocal language. *Close*, 125 F.3d at 36. This is a stringent test. *Atascadero*, 473 U.S. at 241. These statutory provisions at issue in this case do not expressly provide for an abrogation of Eleventh Amendment immunity. As a result, the Eleventh Amendment bars Plaintiff's suit for these claims.

The Court need not decide the question of whether the common law doctrine of sovereign immunity bars monetary damages for these provisions, as this is a novel issue best left to the state court. Thus, the Court grants the Defendant's motion to dismiss on these counts. The state law claims in Counts Six and Seven are dismissed without prejudice to refile in state court.

**E.      Right to Jury Trial**

Defendant argues that Plaintiff has no right for a trial by jury on her requests for equitable relief. The request to strike Plaintiff's claim for a trial by jury is denied as moot; however, Defendant may renew these arguments if Plaintiff amends her complaint regarding the Title VII count.


**IV.**

For the reasons stated above, Defendant's Motion to Dismiss Plaintiffs' Complaint [Doc. 11-1] is

18

GRANTED IN PART AND DENIED IN PART.

Plaintiffs may file an Amended Complaint that comports with this Ruling on the question of Title VII liability for the state within thirty (30) days of the ruling, if they so choose. If the Plaintiff does not do so, the Clerk is directed to close the file.

The Defendant is directed to file its Answer to an Amended Complaint within thirty (30) days of the filing of an Amended Complaint.

It is SO ORDERED.


Dated:   New Haven, Connecticut
         March 23, 2016

                                             */s/ Charles S. Haight, Jr.*        _
                                             CHARLES S. HAIGHT, JR.
                                             Senior United States District Judge